UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| **KAREN LEE BROWDER** | **CASE NO. 3:19-CV-0326** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **ANDREW SAUL, COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAREN L. HAYES** |

## REPORT & RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **REVERSED and REMANDED for further proceedings.**

## Background & Procedural History

Karen Browder filed the instant application for Title II Disability Insurance Benefits on October 4, 2016. (Tr. 14, 159-162). She alleged disability as of October 24, 2009, because of a fractured left hip and wrist, chronic migraines, bulging discs with deteriorating bone disease in the lower back, chronic lower and upper back pain, torn menisci in the left and right knee causing chronic pain, shoulder pain radiating down the right arm, limited movement and strength in the left hand, depression, and anxiety. (Tr. 180, 183). The state agency denied the claim at the initial stage of the administrative process. (Tr. 84-96). Thereafter, Browder requested and received a January 18, 2018, hearing before an Administrative Law Judge ("ALJ"). (Tr. 32-83). However, in a March 29, 2018, written decision, the ALJ determined that Browder was not disabled under the Social Security Act, finding at step four of the sequential evaluation process that she was able to return to past relevant work, or alternatively at step five, that she could make

an adjustment to work that exists in substantial numbers in the national economy. (Tr. 12-28). Browder sought review of the adverse decision before the Appeals Council. On January 11, 2019, however, the Appeals Council denied Browder's request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On March 13, 2019, Browder filed the instant pro se complaint for judicial review of the Commissioner's decision. She contests the sufficiency of the ALJ's findings at several steps of the sequential evaluation process and thus, seeks reversal and remand for an award of benefits. The matter is fully briefed and ripe.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, (5th Cir. 1994).

**Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. § 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1)(A). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. § 423(d)(2)(A). Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual who does not have a "severe impairment" of the requisite duration will not be found disabled.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without the consideration of vocational factors.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

3

(5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis; under the fifth step, however, the Commissioner must show that the claimant is capable of performing work in the national economy and is therefore not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987). When a finding of "disabled" or "not disabled" may be made at any step, the process is terminated. *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). If at any point during the five-step review the claimant is found to be disabled or not disabled, that finding is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

## ALJ's Findings

### I. Steps One, Two, and Three

The ALJ determined at step one of the sequential evaluation process that the claimant had not engaged in substantial gainful activity during the relevant period. (Tr. 17). At step two, he found that the claimant suffers severe impairments of lumbar degenerative disc disease; history of healed left wrist fracture with reflex sympathetic dystrophy; history of healed left hip fracture; right rotator cuff repair; right knee meniscus tear; and migraines. (Tr. 17-19).[1] He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 19-21).

---

[1] He further found that the claimant's medically determinable impairments of gastroesophageal reflux disease ("GERD"), hypertension, depression, and anxiety were not severe. *Id.*

4

## II.     Residual Functional Capacity

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform sedentary work,[2] except that she was limited to only occasional balancing, stooping, kneeling, crouching, and crawling; only occasional overhead reaching with the upper extremities; limited to frequent use of upper extremities to handle, finger, and feel; no outside work; only occasional exposure to atmospheric conditions (such as fumes, noxious odors, dust, mists, gases, and poor ventilation); she also cannot work in loud or very loud noise environments.  (Tr. 21-25).

## III.    Steps Four and Five

At step four, the ALJ employed a vocational expert ("VE") to find that the claimant was able to return to her past relevant work as an insurance clerk, both as she actually performed that job, and as it is generally performed in the national economy.  (Tr. 25-26).[3]

The ALJ also proceeded to make an alternative step five finding.  At this step, the ALJ determined that the claimant was an individual closely approaching advanced age on the date last insured.  (Tr. 26-27).  She also had at least a high school education, with the ability to communicate in English.  *Id*.  The ALJ documented a number of transferrable skills that the

---

[2] Sedentary work entails:
> . . . lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).

[3] Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'" *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61).

5

claimant had obtained from her past relevant work. *Id.*

The ALJ then observed that, given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. § 404.1569; Rule 201.15, Table 1, Appendix 2, Subpart P, Regulations No. 4; Tr. 26-27. However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted the VE to determine whether, and to what extent the additional limitations eroded the occupational base for work at all exertional levels. *Id.* In response, the VE identified the representative jobs of check cashier, *Dictionary of Occupational Titles* ("DOT") Code # 211.462-026 - sedentary; and food checker, DOT # 211.482-014 - sedentary, that were consistent with the ALJ's RFC and the claimant's vocational profile. (Tr. 27, 77-82.[4]

## Non-Exhaustive Chronology of Relevant Medical Evidence

On January 22, 2003, Steven McMahan, M.D., wrote a to whom it may concern letter, wherein he stated that plaintiff was a patient of his that he followed for chronic, recurring migraine headaches that occasionally were disabling, causing her to suffer from brief episodes of incapacitation that occasionally would require her to miss work. (Tr. 222, 662). He added that she was being treated with numerous medications. *Id.*

On January 6, 2006, Dr. McMahan wrote another note which stated that Browder suffered from migraine headaches with unexpected periods of incapacitation. (Tr. 223, 661).

---

[4] The VE responded that for the check cashier job there were 167,280 positions nationwide, whereas for the food checker job there were 109,793 positions nationwide. (Tr. 27, 77-78). This incidence of work constitutes a significant number of jobs in the national economy. 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

6

On September 20, 2007, plaintiff saw Dr. McMahan for migraine follow-up. (Tr. 545-546). Her complaints of headaches were stable on medication. *Id.* McMahan diagnosed depression. *Id.*

On September 10, 2008, plaintiff complained of left shoulder pain caused by pulling the attic door down two weeks earlier. (Tr. 433-434). A December 8, 2008, MRI of the left shoulder revealed no significant abnormality. (Tr. 364).

On October 6-7, 2008, plaintiff went to Glenwood Regional Medical Center with complaints of headache. (Tr. 231-237, 248-252, 259-272). She had a throbbing migraine that had been present for two hours before presentation. *Id.* She described her pain as the "worst headache of [her] life." (Tr. 260). It differed from her previous headaches. *Id.* CT scans of the head and brain were normal, however. (Tr. 293-294).

On September 3, 2009, plaintiff saw Dr. McMahan for complaints of fever, fatigue/weakness, follow-up for low back pain and depression. (Tr. 430-432). Although review of symptoms included migraine headaches, it was not included in the history of the present illness. *Id.*

On October 24, 2009, plaintiff went to Glenwood Regional Medical Center, following a fall. (Tr. 238-247, 253-258, 274-292). Plaintiff arrived on a backboard in mild distress. *Id.* She described her pain as an eight on a ten-point scale, but she was assessed with moderate pain. *Id.* She underwent a wrist reduction, and a cast was placed on her left arm. *Id.* She also had a puncture wound, with a small laceration above her left eye. (Tr. 283). A CT scan of the head showed no acute intracranial process. (Tr. 256). A CT scan of the left hip showed a nondisplaced acetabular fracture. (Tr. 295). X-rays of the left wrist showed a comminuted

7

impacted fracture of the distal radius with avulsion of the ulnar styloid.  (Tr. 257, 299).

On November 4, 2009, plaintiff saw Douglas Brown, M.D., an orthopedist.  (Tr. 301-302).  He noted that Browder had been sitting on a tailgate smoking a cigarette when she fell off and hit the ground, striking her left wrist, hip, and leg.  *Id.*  She went to the hospital and was told that she might have a "brain bleed."  *Id.*  However, she was evaluated and released.  *Id.*  Plaintiff presented to Dr. Brown on a stretcher board, with pillows.  *Id.*  Her left wrist was in a sugar tong splint.  *Id.*  Neurologic examination of the hand was intact.  *Id.*  Her left hip had painful passive movement, but good alignment.  *Id.*  Rotation was intact.  *Id.*  X-rays taken that day showed a healing, two-week old comminuted Colle's fracture in reasonable position.  *Id.*  The left hip acetabular fracture essentially was non-visible on x-rays that day.  *Id.*  Brown placed Browder in a short arm cast in slight ulnar deviation and flexion.  *Id.*  He sent her for a forearm platform walker to allow progressive weight bearing on the left leg.  *Id.*  She was to recheck with him in two weeks, and if there was any further angulation or displacement, then she might require open reduction and internal fixation or possibly an external fixator.  *Id.*

Plaintiff returned to Dr. Brown on November 9, 2009.  (Tr. 303).  She was doing well.  *Id.*  Her left wrist was healing in excellent position.  *Id.*  She was to return in three weeks.  *Id.*

Plaintiff next returned to Dr. Brown on December 10, 2009.  (Tr. 304).  Her left wrist had healed.  *Id.*  There was some comminution, but overall, the wrist was out to length.  *Id.*  The left hip acetabular fracture was healed on x-ray.  *Id.*  She walked with no pain, had good balance, and a full range of motion of the hip.  *Id.*  He removed her cast and placed her on a wrist immobilizer.  *Id.*

On January 14, 2010, plaintiff returned to Dr. Brown.  (Tr. 305).  Her left arm was

8

swollen. *Id.* She had adhesive capsulitis and discoloration of the left hand with hypersensitivity. *Id.* She also had a painful MP joint with loss of movement. *Id.* Dr. Brown diagnosed reflex sympathetic dystrophy syndrome. *Id.* He prescribed medication and referred her to occupational therapy. *Id.* He noted that she might need an interscalene block. *Id.*

Plaintiff's last visit to Dr. Brown occurred on February 18, 2010. (Tr. 306). Her left arm had a mottled appearance, with a cooler temperature. *Id.* Brown diagnosed "left arm posttraumatic reflex sympathetic dystrophy references" and chronic regional pain syndrome. *Id.* He instructed her to continue her therapy with the occupational therapist and referred her to pain management for interscalene versus sympathetic nerve block. *Id.* He prescribed Darvocet-N 100 and refilled the Neurontin. *Id.*

On August 12, 2010, plaintiff saw Dr. McMahan for a wellness examination. (Tr. 427-429). Browder wanted a referral to Sid Bailey for previous left hip fracture, left wrist fracture, plus back pain, and to Dr. Greer for previous head injury and current migraines. *Id.* She complained of headaches and migraines at times. *Id.* She occasionally took Lortab and Flexeril for her lower back and left hip pain. *Id.* Her anxiety was controlled with medication, which she took as needed. *Id.* Her motor strength was 3/5 in her left forearm and biceps. *Id.* She had abnormal sensory examination with decreased left forearm and distal. *Id.* She had gross atrophy in her left forearm muscles. *Id.* Her gait was normal. *Id.*

On April 18, 2011, plaintiff saw Dr. McMahan for complaints of right knee pain that had been present for one week. (Tr. 418-419). She reported a fall one week earlier and had been experiencing pain since that time. *Id.* Upon inspection, the knee had mild edema medially, and tenderness. *Id.* She had normal flexion and extension, however. *Id.* McMahan diagnosed an

9

MCL strain. *Id.*

On April 26, 2011, plaintiff saw Dr. McMahan for follow-up for her right knee pain/swelling. (Tr. 416-417). She stated that if she was up for a long time, she had pain and swelling. *Id.* McMahan diagnosed MCL strain, with pain in the limb. *Id.*

On August 19, 2011, plaintiff returned to Dr. McMahan with complaints of right knee pain, weight gain, fatigue, mind never stopping, and migraine follow-up. (Tr. 411-413). She had complaints of right knee pain for the past two to three weeks, which had improved with a cortisol shot. *Id.* She requested another shot. *Id.* She complained of sleep disturbances because her mind never stopped worrying. *Id.* She had complaints of typical migraine symptoms that were controlled on medicine. *Id.* She denied depression. *Id.* Upon inspection, she had right knee tenderness, but normal flexion and extension. *Id.* Her gait was very limited due to pain. *Id.*

An August 30, 2011, MRI of the right knee showed a large bone contusion; medial femoral condyle, with small subcortical contusion medial aspect of the patella; as well as a small contusion in the fibular head; a small horizontal tear in the anterior horn of the lateral meniscus, with slight increased fluid in the lateral compartment; but no other significant finding. (Tr. 357).

On August 2, 2012, plaintiff complained of tingling/numbness to her left hand. (Tr. 509-511). An August 2, 2012, x-ray of the lumbar spine showed mild scoliosis and spondylosis. (Tr. 354). The bones were osteopenic. *Id.* An August 17, 2012, MRI of the lumbar spine showed mild dorsal bulging of the L5-S1 intervertebral disc without herniation. (Tr. 353). The bulging did not significantly narrow the spinal canal diameter or neuroforamina. *Id.* The MRI

10

otherwise was unremarkable.  *Id.*

On January 24, 2013, plaintiff saw nurse practitioner Elizabeth Barron for left ankle pain. (Tr. 393-395).  She complained of radiation of pain to her lower leg/lateral aspect of the foot. *Id.*  She reported that she had been sitting on her leg, did not realize that her leg was "asleep," then fell to the ground when she tried to stand up.  *Id.*  An x-ray of the left ankle showed no acute fracture, dislocation, or soft tissue swelling.  (Tr. 350).

Plaintiff saw Dr. McMahan on September 4, 2013, for follow-up for depression with anxiety, hypercholesterolemia, osteoarthritis, migraines, and GERD.  (Tr. 390-392).  Her depression was controlled with medication, but she wanted something cheaper because she no longer had insurance.  *Id.*  Range of motion of the lumbar spine was about 75 percent with pain. *Id.*  Straight leg raise was negative.  *Id.*  She walked with a slight limp.  *Id.*

On March 12, 2015, plaintiff saw Dr. McMahan for follow-up for migraines, degenerative disc disease, depression with anxiety, GERD, and arthritis.  (Tr. 387-389, 495-497).  She reported that her migraines were the same and that she experienced at least one to two migraines per week that lasted up to three days at a time, associated with nausea.  *Id.*  Her arthralgias were controlled on medication, as was her depression and anxiety.  *Id.*  Upon examination, she had mild diffuse edema of the left posterior shoulder.  *Id.*  She had a limited range of motion above her head, with diminished supraspinatus strength.  *Id.*  She exhibited pain with the 90-degree portion of the arc.  *Id.*  Neer test and Hawkin's sign were positive.  *Id.* McMahan's primary diagnosis was migraines.  *Id.*  An x-ray of the thoracic spine showed moderate lower thoracic spondylosis.  (Tr. 349).

On March 25, 2015, plaintiff complained to Dr. McMahan of right knee pain for the past

11

two days. (Tr. 384-385). She was walking and fell on the concrete driveway, landing on her right knee. *Id.* She had experienced problems with that knee in the past. *Id.* McMahan diagnosed knee contusion and knee pain. *Id.* An x-ray of the right knee was normal. (Tr. 348).

On June 6, 2016, Browder returned to Dr. McMahan for follow-up of her left knee, hip, and hand pain, anxiety, GERD, hormone replacement, hypercholesterolemia, migraines, and hypertension. (Tr. 376-378). Although plaintiff complained of left wrist pain, she denied radiation, swelling, redness, tingling, numbness, weakness, previous injury, direct trauma, joint pain, and carpal tunnel syndrome. *Id.* The pain was caused by a previous injury. *Id.* Her anxiety was controlled on medication. *Id.* Upon inspection, her left knee showed no swelling or redness, or tenderness. *Id*. She had tenderness to palpation of her left wrist, with mild edema, but no redness or warmth. *Id.*

A September 9, 2016, x-ray of the lumbar spine showed bones that were markedly osteoporotic. (Tr. 347). There was no interspace narrowing, sublaxation, or fracture, however. *Id.* Spurring was noted at the L2-3 and L3-4 disc interspaces suggesting degenerative disc disease. *Id.* An x-ray of the right hip showed no fracture or dislocation, but suspected osteoporosis. *Id.*

On October 20, 2016, Browder saw nurse practitioner Kimberly Hawkins following a fall. (Tr. 369-370). She complained of pain in her right foot. *Id.* She had visible bruising and swelling in her lower digits and was unable to move them. *Id.* An x-ray of the right toe was taken but revealed no fracture or malalignment. (Tr. 346).

On October 31, 2016, Browder again saw Kimberly Hawkins for complaints of left hip

pain, lower back pain, and left leg pain. (Tr. 367-368). Browder reported that her left hip had been hurting since last week, which was causing her lower back to hurt down her left leg. *Id.* She reported that she quit smoking four months earlier. *Id.* She was taking Relpax once per day, as needed, but no more than two in 24 hours. *Id.* She was diagnosed with left hip pain. *Id.*

On February 28, 2017, plaintiff reported to Dr. McMahan that she had complaints of left wrist pain with very limited range of motion after breaking it in 2009. (Tr. 679). She had complaints of mild to moderate swelling, weakness, and joint pain. *Id.* However, her diagnoses did not include anything for the left arm pain. *Id.*

On February 28, 2017, Dr. McMahan completed an attorney-supplied Medical Statement Regarding Headaches for Social Security Disability Claim. (Tr. 671-673). He indicated that Browder suffered from migraine, cluster and muscle-tension headaches with the following associated symptoms: prodromal symptoms, nausea and vomiting, irritability, photophobia, increased sensitivity to noise, facial vasodilation, and injection of conjunctiva. *Id.* He indicated that the headaches occurred several times per week and lasted between one to several days. *Id.* He stated that plaintiff was unable to work while suffering a headache. *Id.* He also indicated that plaintiff had experienced these extreme limitations since 2003. *Id.*

## **Analysis**

The issue before the court is plaintiff's eligibility for Title II benefits, which requires a finding of disability prior to December 31, 2013 -- the date that plaintiff was last insured for benefits. (Tr. 17). Therefore, the relevant period under discussion extends from October 24, 2009 – plaintiff's alleged disability onset date – through December 31, 2013. *See* Tr. 17.

Further complicating the matter is that plaintiff stopped working on August 18, 2008, over one year before her alleged disability onset date because of a restructuring by her employer. *See* Tr. 183-184. She continued looking for alternative employment until October 24, 2009, when she was injured following a fall from a pickup truck. *See* Tr. 39, 43.

## II. Step Two

Plaintiff effectively contends that the ALJ erred when he determined that her mental impairments were non-severe. In assessing the severity of an impairment, the Fifth Circuit has determined that "an impairment can be considered as not severe only if it is a slight abnormality [having] such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Loza v. Apfel*, 219 F.3d 378, 391 (5th Cir. 2000) (citing *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985)). However, when, as here, the ALJ's analysis proceeds beyond step two of the sequential evaluation process, strict adherence to *Stone* and its requirements is not required. *See Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Chapparo v. Bowen*, 815 F.2d 1008, 1011 (5th Cir. 1987); *Jones v. Bowen*, 829 F.2d 524, n. 1 (5th Cir. 1987).

Rather, under these circumstances, the effect of the ALJ's step two determination is measured by whether his step three finding and RFC are supported by substantial evidence. This is so because once at least one severe impairment is determined to exist, all medically determinable impairments must be considered in the remaining steps of the sequential analysis. *See* 20 C.F.R. §§ 404.1545, 416.945. Indeed, the ALJ recited the foregoing regulation, and proceeded to consider the medical record and the aggregate impact of plaintiff's impairments. *See* Tr. 16.

Plaintiff does not contest the ALJ's determination that her impairments do not meet or equal a listing at step three. Therefore, the critical issue becomes whether the ALJ's residual functional capacity assessment is supported by substantial evidence – in particular, his determination that plaintiff's *mental* impairments did not reduce her capacity for work.

In his decision, the ALJ noted plaintiff's allegations of nigh lifelong depression and anxiety that she traced at least as far back as her marriage to an abusive husband while still a teenager. (Tr. 17-19). Nonetheless, she received no more than conservative and sporadic treatment for her alleged psychological symptoms. *Id*. Moreover, despite these impairments, plaintiff managed to successfully perform skilled work as an insurance clerk. *Id*. Importantly, there is no evidence of a sustained deterioration of her mental impairments following the alleged onset of disability through the date that she last was insured for benefits. Rather, Dr. McMahan consistently documented that her depression and anxiety were controlled by medication. (Tr. 390-392, 427-429). Accordingly, the court discerns no cognizable error stemming from the ALJ's consideration of the effects of plaintiff's mental impairments.

**II.     RFC (Physical)**

Plaintiff told the ALJ that the main problem that kept her from working was her migraines. (Tr. 65-66). However, the ALJ discounted the frequency and severity of plaintiff's migraines in no small part because she was able to work at Haven Home Health for one year without her employer's having to accommodate her migraines. *See* Tr. 24, 41. Moreover, while plaintiff stated that her migraines worsened following her October 24, 2009, accident, Dr. McMahan completed a medical source statement in which he documented that the limitations from plaintiff's migraines had remained the same since 2003. *See* Tr. 671. Therefore, if

15

plaintiff had been able to work for one year without accommodations, despite the presence of her migraines, which, according to Dr. McMahan, had remained consistent from 2003 through 2017, this would provide substantial evidence to support the ALJ's assessment regarding the effects of her migraines.[5]

More problematic from the court's perspective is the ALJ's assessment of the effects of plaintiff's left wrist impairment, her right shoulder impairment, her lumbar degenerative disc disease, and right knee meniscus tear. The ALJ found that these impairments were severe. Moreover, they were documented in the medical records and supported by objective evidence. *See* discussion, *supra*. The non-examining agency physician, Evette Budrich, M.D., reviewed plaintiff's medical records, but determined that there was insufficient evidence to rate the effects of plaintiff's impairments because of the absence of a functional description of said impairments prior to the date that she last was insured. (Tr. 89-90). The ALJ purported to discount Dr. Budrich's assessment on the basis that she had insufficient evidence to make a determination. (Tr. 24). However, that is precisely why Dr. Budrich said that she was unable to evaluate plaintiff's impairments in the first instance.

Instead, the ALJ evaluated the effects of plaintiff's impairments on his own. In so doing, he eschewed the opportunity to re-contact plaintiff's treating physician who had treated

---

[5] In her brief, plaintiff argues that Haven Home Health did not notice when she was not there, and thus, she could be absent or work from home when her migraines flared. However, before accepting the position at Haven Home Health, plaintiff had a good job that, according to her, accommodated her migraines. Before she accepted the position at Haven Home Health, there was no indication that her new employer would accommodate her migraines. Certainly, if plaintiff's migraines were as intense and as frequent as she claims, she would not have risked leaving her prior job that accommodated her migraines to take a new job that might not have accommodated her migraines.

16

plaintiff throughout the relevant period and thus, was intimately familiar with the effects of her impairments. He also opted not to send plaintiff to a consultative orthopedist who could have examined plaintiff, listened to her history, and reviewed her treatment records to extrapolate backwards the effects of her impairments prior to December 31, 2013, before issuing a medical source statement regarding the effects of those impairments.[6]

If the agency physician was unable to assess the effects of plaintiff's impairments on the basis of the record before her, it is difficult to discern how the ALJ, a non-medical professional, was able to review essentially the same medical record and divine plaintiff's RFC on his own. In addition, plaintiff's testimony did not support the ALJ's RFC. For example, she stated that she essentially needed a sit/stand option. *See* Tr. 61. Moreover, she could hardly do anything with her left hand, which hurt her all of the time. (Tr. 45). She also had arthritis in the fingers of her right hand. *Id*. As a result, she testified that she no longer could use a computer. (Tr. 45-46). The ALJ said that he accounted for the effects of these impairments by limiting plaintiff to only occasional overhead reaching and only frequent (as opposed to constant) use of her hands and fingers. (Tr. 23). However, the court does not perceive any basis in the record to support the ALJ's unilateral assessment of the effects of plaintiff's physical impairments.

Accordingly, the undersigned is constrained to find that the ALJ's RFC is not supported by substantial evidence. *See Williams v. Astrue*, 2009 WL 4716027 (5th Cir. Dec. 10, 2009) (unpubl.) ("an ALJ may not rely on his own unsupported opinion as to the limitations presented

---

[6] The Commissioner's Hearings, Appeals and Litigation Law Manual ("HALLEX") authorizes an ALJ to take this course of action when "the claimant does not provide adequate evidence about his or her impairment(s) for the ALJ to determine whether the claimant is disabled or blind, and the ALJ or the HO staff is unable to obtain adequate evidence from the claimant's medical source(s) . . ." (HALLEX § I-2-5-20).

17

by the applicant's medical conditions"); *Ripley v. Chater,* 67 F.3d 552, 557-558 (5th Cir. 1995) (substantial evidence lacking where: no medical assessment of claimant's residual functional capacity, and claimant's testimony was inconsistent with ALJ's assessment); *Butler v. Barnhart*, Case Number 03-31052 (5th Cir. 06/02/2004) (unpubl.) (in the absence of medical opinion or evidence establishing that the claimant could perform the requisite exertional demands, the ALJ's determination is not supported by substantial evidence).

### III. Steps Four, Five and Remand

Because the foundation for the ALJ's step four and alternative step five determinations were premised upon an RFC that is not supported by substantial evidence, the court further finds that the Commissioner's ultimate conclusion that plaintiff is not disabled, likewise is not supported by substantial evidence.

The courts enjoy the authority to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. 42 U.S.C. §405(g). When reversal is warranted, the matter is remanded with instructions to make an award only if the record enables the court to conclusively determine that the claimant is entitled to benefits. *See Ferguson v. Heckler*, 750 F.2d 503, 505 (5th Cir. 1985); *see also Rini v. Harris*, 615 F.2d 625, 627 (5th Cir.1980) (reversing and remanding with direction to enter judgment where the evidence was not substantial, and the record clearly showed the claimant's right to benefits).

The instant record is not so disposed. Plaintiff's residual functional capacity assessment remains indeterminate, and it is not at all clear that she is disabled under the Act. Upon remand, the Commissioner may contact plaintiff's treating physician and ask him to complete a medical source statement. Alternatively, the Commissioner may send plaintiff for a consultative examination(s).

## Conclusion

For the foregoing reasons,

IT IS RECOMMENDED that the Commissioner's decision be REVERSED and REMANDED pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent herewith.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 2nd day of January 2020.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE